### HENDERSON et al. v. BROWN (GALLAHER et al., Interveners).

#### No. 740.

District Court, W. D. Louisiana, Shreveport Division.

March 20, 1937.

W. T. Bennett, of Baton Rouge, La., and Dickson & Denny, of Shreveport, La., for complainants.

Smitherman & Smitherman, Lee & Lee, Cook, Cook & Egan, and Herold, Cousin & Herold, all of Shreveport, La., for respondents.

White, Holloman & White, of Alexandria, La., for interveners.

DAWKINS, District Judge.

Plaintiffs and interveners, alleging themselves to be stockholders, owning more than 2 per cent. of the capital stock of the Commercial National Bank of Shreveport, bring this suit in equity to compel the receiver appointed by the Comptroller of the Currency to permit them to examine and have an audit made of the books and affairs of said bank. They allege that it had a capital of $1,000,000 and that on December 6, 1936, it entered into a contract with the Commercial National Bank in Shreveport, by which all of the assets of the former were transferred to the latter under terms and conditions as set forth in a contract, copy of which is annexed to the petition; that the old bank went into voluntary liquidation, and more than three years thereafter, when some of petitioners had made repeated efforts to obtain information as to the affairs of the closed bank, without success, and it had been decided that they could and should proceed in the state court for a writ of mandamus to compel the liquidators to permit an audit and examination of its affairs, the said liquidators "petitioned the Comptroller of the Currency for the appointment of a receiver for the Commercial National Bank of Shreveport," which was done; that petitioners were compelled to abandon their proceeding for an audit in the state court and to resort to this court for relief; that there were gross inequities in the contract between the two banks; that the "new bank consists of fourteen individuals who own 1832½ shares of the capital stock of the old bank. Each of these individuals, excepting one, were directors, and some of them were officers of the old bank," and that the contract under which they took over the assets of the old bank gave unlimited powers to the new bank in the matter of disposing of the assets so transferred and applying the same to the indebtedness assumed by the latter; that the contract, among other things, provided that, of the three liquidating commissioners of the old bank, any two could be members of the board of directors of the new bank, and, since any two of said committee could act, it "was nothing more or less than the new bank itself." Further, that under said contract, the old bank executed a note in favor of the new bank in the sum of $1,000,000, bearing 6 per cent. per annum interest, "to supplement the assets purported to be conveyed," and to "indemnify and make whole the new bank * * * in the assumption of the liability of the old bank;" that the bank building formerly owned and occupied by the old bank "was turned over to the new bank, at a figure of $500,000," notwithstanding just prior to the transfer it had been carried on the books of the old bank at a figure of $773,000; and that the furniture and fixtures were also carried on said books at $143,532.69, and, presently, the value of the building has been reduced to $350,000, inclusive of furniture and fixtures. Further, that in said contract the assets were divided into classes A, B, and C, and the new bank was authorized to charge 6 per cent. per annum interest on class B assets, with the right of substitution of the new bank at its discretion, as between classes B and C; that petitioners "are completely in the dark as to what amount the old bank has been charged interest at 6%, but that petitioners do know the old bank is being charged at said rate upon the value of the bank building fixed in the contract of $500,000, or $30,000 per annum;" that among said assets are also approximately 4,000 shares of the capital stock of the Continental-American Bank & Trust Company, "upon which stock

there has until recently been no dividend declared and upon which amount or value thereof at par of $100.00 per share, the stockholders of the old bank are paying 6% interest, or $24,000." Petitioners further allege that this stock is being used by the new bank to control the Continental-American Bank & Trust Company. They then give the financial set-up of the said state bank as of December 31, 1932, showing capital, surplus, and undivided profits of $940,530.84, as compared to a similar set-up on December 31, 1936, of $916,916.20, revealing a loss in four years of $23,614.64; whereas, the new Commercial National Bank, with a capital of only $125,000 greater than the state bank, during the same period made a profit of $601,265.42.

Further, that the old bank owns stock in other banks as well as a subsidiary known as the Commercial National Company, Inc., the value of which and the disposition made thereof "is not known to petitioner and cannot be determined without an audit."

That immediately prior to the entering into the contract above referred to the old bank published a sworn statement or report made to the Comptroller under date of September 30, 1932, the figures of which are given in full in the petition, and from which it appeared that the old bank "was in a strong, liquid financial condition and that hence there was no reason or necessity for the liquidation thereof. Petitioners show that the above and foregoing statement was sworn to by the officers of the old bank as being true and correct;" that, if true, there was no occasion for liquidation, but, if not, then a fraud had been committed upon the stockholders, including petitioners, and "the only possible way the stockholders of the old bank can secure information as to whether or not there have been false and misleading statements made of the old bank, is by means of a complete audit of the books and records thereof." Further, that in the attempted depreciation of the value of the bank building from $773,000, at which it had been carried on the books of the old bank, to the sum of $350,000, since it has been in liquidation, is "patently indicative of mal-administration," and shows that the interests of the old bank "are being squandered and frittered away, and that they

may be because of this mal-administration, subjected to an assessment on their stock at any time, and it behooves them to inquire into the conduct of their affairs, a disinterested and unbiased report of which they have not received for almost four years, and which has been denied them by the liquidators and by the receivers and by the Comptroller of the Currency."

Petitioners further allege as follows:

"21. Your petitioners are informed, believe and therefore allege that the Receiver has never had an itemized inventory from the Liquidators of the old bank and that, therefore, he is not in a position to properly represent the old stockholders' interests."

"22. Petitioners now show that both oral and written demand have been made upon the Receiver, the Comptroller of the Currency and the new bank for permission to have the books and records audited and examined by an expert and that they have been unable to obtain from defendants this permission."

"23. Petitioners show that under the law they are entitled to have a competent expert to examine said books and records in order that they may determine the true and correct status of their interests and, ascertain what progress has been made in the liquidation of the Commercial National Bank of Shreveport, and to determine the true situation as to the value of their stock and what has become of the assets of the Commercial National Bank of Shreveport."

"24. Petitioners show that they have been caused tremendous loss and damage by inability to secure an examination and audit of the books and records of the Commercial National Bank of Shreveport, and that they do hereby expressly reserve all rights to sue the proper parties for any and all damages so caused."

Complainants pray that a writ of mandamus issue to the receiver, the new bank and its officers, to show cause why they should not "be permitted to examine with the assistance of such experts, auditors and stenographers as petitioners may require, all of the books, papers, documents and records of the Commercial National Bank of Shreveport, (the old bank) in the custody and possession of the new bank," and, upon hearing, that the writ of mandamus be made absolute.

They further pray for "all orders necessary and for general relief."

The interveners make substantially the same allegations.

Respondents have moved to dismiss the complaint on the ground that the court is without jurisdiction and power to issue a mandamus.

My view is that the allegations of the bill do state a cause of action entitling this court to grant relief. It is substantially the same as that sought in the case of Wittnebel v. Loughman (C. C.A.) 80 F.(2d) 222. It is true that the prayer is for a mandamus, which, under the state law, is a statutory writ or remedy, and which has been held in some cases (not, however, involving the rights of stockholders in a closed national bank) cannot be issued by a federal trial court, except in aid of jurisdiction already attached. In the present case, in addition to the prayer for mandamus, there is one "for general and equitable relief," which would permit a court of equity to grant such relief as the allegations of the petition justified, if proven, and, if it is found ultimately that mandamus cannot issue, then the respondents might, as in the Wittnebel Case, be enjoined from refusing to permit plaintiffs to obtain from the records of their company the information desired. See R.C.L. vol. 10, p. 422 et seq., § 181, title "Equity," and cases cited in footnote No. 7. It would appear from the decision in the Wittnebel Case and authorities therein cited that a wide discretion in matters of this sort on the part of the trial court is permitted in order to insure justice to those whose property has been taken under the administration of an executive department of the government and in which they are not allowed to participate. I do not believe there is any absolute rule or line of decisions that make an administration by the Comptroller immune from control by the courts at the instance of stockholders in a closed national bank when the grounds of their complaint show a substantial case of probable injury if the courts were closed to them.

The court takes cognizance of the fact that application has been made to it for authority to sell one of the principal assets of the old bank, to wit, the bank building, furniture, fixtures, etc., which have been advertised for sale on the 27th day of March, 1937. If it should develop upon an examination of the affairs of the old bank that a proper adjustment of accounts would make it unnecessary to sell the building in question at this time, or any other arrangement by which the balance due upon the debt of the new bank could be satisfied, then the stockholders of the old bank, it would seem, would be entitled to assert the relief which such a situation might justify.

After the answer of the respondents has been filed and the facts disclosed, the court will be in a better position to determine the equities as to whether or not the defendants should be restrained from denying to petitioners the relief sought. The motion to dismiss should be denied.

Proper decree should be presented.